# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **WILL A. ABSHER,** | ) | |
| Plaintiff | ) | |
| v. | ) | Civil Action No. 2:14cv00005 |
| | ) | **MEMORANDUM  OPINION** |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of** | ) | |
| **Social Security,** | ) | By:   PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Will A. Absher, ("Absher"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423 and 1381 *et seq.* (West 2011 & West 2012). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge upon transfer by consent of the parties pursuant to 28 U.S.C. § 636(c)(1).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance."  *Laws v. Celebrezze,* 368 F.2d 640, 642

(4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Absher protectively filed his applications for SSI and DIB on May 14, 2010, alleging disability as of July 31, 2007, due to Hepatitis C, depression, anxiety, latent tuberculosis, abdominal pain, GERD and chronic back pain. (Record, ("R."), at 208-09, 212-15, 248, 252, 276,) The claims were denied initially and upon reconsideration. (R. at 112-14, 118-20, 123-25, 129-31, 134, 139-41, 143-45, 146-48, 150-52.) Absher then requested a hearing before an administrative law judge, ("ALJ"). (R. at 153-54.) A hearing was held by video conferencing on September 25, 2012, at which Absher was represented by counsel. (R. at 30-49.)

By decision dated October 15, 2012, the ALJ denied Absher's claims. (R. at 13-23.) The ALJ found that Absher met the disability insured status requirements of the Act for DIB purposes through June 30, 2012. (R. at 15.) The ALJ found that Absher had not engaged in substantial gainful activity since July 31, 2007, the alleged onset date. (R. at 15.) The ALJ found that the medical evidence established that Absher had severe impairments, namely Hepatitis C; latent positive tuberculosis; major depressive disorder; intermittent explosive disorder; personality disorder; and a history of polysubstance abuse in sustained full remission, but he found that Absher did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 16-17.) The ALJ found that Absher had the residual functional capacity to perform simple, routine, repetitive medium

work[1] requiring no more than occasional interaction with co-workers or the public in a low-stress environment, which he defined as an environment requiring only occasional decisionmaking or changes in the work setting.[2]  (R. at 17-21.)  The ALJ found that Absher was unable to perform any of his past relevant work.  (R. at 21.)  Based on Absher's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of jobs existed in the national economy that Absher could perform, including jobs as a hand packager, a laundry worker and a garment folder. (R. at 21-22.) Thus, the ALJ concluded that Absher was not under a disability as defined by the Act and was not eligible for DIB or SSI benefits. (R. at 23.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2014).

After the ALJ issued his decision, Absher pursued his administrative appeals, (R. at 7-9), but the Appeals Council denied his request for review.  (R. at 1-5.) Absher then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2014). This case is before this court on Absher's motion for summary judgment filed August 18, 2014, and the Commissioner's motion for summary judgment filed September 22, 2014.

---

[1] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If someone can perform medium work, he also can perform light and sedentary work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2014).

[2] The ALJ placed a number of exertional limitations on Absher's work-related abilities. (R. at 17.)  However, because Absher does not challenge the ALJ's findings with regard to his physical impairments, the undersigned will focus on the facts relevant to Absher's alleged mental impairments.

## II. Facts[3]

Absher was born in 1977, (R. at 208, 212), which classifies him as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). He has a high school education and attended special education classes. (R. at 253.) Absher also attended two years of community college, where he obtained a welding certificate. (R. at 34-35, 253.) He has past work experience as a cook, a welder and a general laborer. (R. at 253.) Absher testified that he had a substance abuse problem in the past, mostly with alcohol and some marijuana use, but he stated he had not used those substances in more than a year. (R. at 36.) Absher testified that he stayed nervous and worried about his Hepatitis C diagnosis. (R. at 36.) He testified that he liked to help out around the house, and he liked to mow with a riding mower, but he had to take breaks. (R. at 37-38.) Absher testified that he was nervous all the time, but being around crowds made it worse. (R. at 38-39.) He stated that he experienced panic attacks nearly daily and that he had difficulty with memory and concentration. (R. at 39.) Absher stated that his parents, who lived with him, did most of the grocery shopping, cooking and cleaning. (R. at 39.) He stated that he had a couple of friends, who he visited every couple of days, and he tried to stay out in the sun, as it made him feel better. (R. at 39-40.) However, he stated that most days, he did not want to be around anyone due to his depression. (R. at 41.) Absher testified that he had difficulty sleeping due to his combination of problems, and he noted that he would not be able to sleep without his medicine. (R. at 40-41.) Nonetheless, he testified that he still woke up tired and sometimes had to lie

---

[3] The relevant time period for determining disability in this case is from July 31, 2007, the alleged onset date, through October 15, 2012, the date of the ALJ's decision, for SSI purposes, and through June 30, 2012, the date last insured, for DIB purposes. Also, as previously stated, Absher challenges only the ALJ's findings with regard to his mental impairments. Thus, I will focus on the medical records pertinent thereto.

down during the day or sit in the recliner.  (R. at 41.)  Absher stated that he stayed inside during the winter, as the cold aggravated his pain and depression.  (R. at 41.)  He testified that he had bad days two or three times monthly, when he just sat on the couch.  (R. at 42.)  He stated that despite taking Seroquel, he still heard things, and his mind raced "real bad."  (R. at 43.)

Mark Hielman, a vocational expert, also was present and testified at Absher's hearing.  (R. at 43-48.)  He classified Absher's past work as a company laborer at a coal company as heavy[4] and unskilled and as a welder pitter as medium and skilled.  (R. at 44.)  Hielman testified that Absher's description of the welder pitter job would be classified as heavy, but its general classification is medium.  (R. at 44.)  Hielman testified that a hypothetical individual of Absher's age, education and past work history, who could perform simple, routine, repetitive medium work with certain physical restrictions and that required no more than occasional interaction with the public, could not perform any of Absher's past work.  (R. at 45.)  However, Hielman testified that such an individual could perform other jobs existing in significant numbers in the national economy, including jobs as a hand packager, a laundry worker and a small products assembler or bench assembler.  (R. at 45-46.)  Hielman next testified that the same hypothetical individual, but who could only occasionally interact with co-workers, as well as with the public, who must work in a low-stress job, which was defined as having only occasional decision-making and occasional changes in the work setting, and who must work in a job requiring no more than occasional judgment,

_____

[4] Heavy work involves lifting items weighing up to 100 pounds at a time with frequent lifting or carrying of items weighing up to 50 pounds. If someone can perform heavy work, he also can perform medium, light and sedentary work. *See* 20 C.F.R. §§ 404.1567(d), 416.967(d) (2014).

Case 2:14-cv-00005-PMS   Document 16   Filed 07/31/15   Page 5 of 30   Pageid#: 1409

could perform the jobs of the laundry worker and the hand packager previously listed, as well as the job of a garment folder and packager. (R. at 46-47.) Hielman testified that the same hypothetical individual, but who could have no interaction with the public, who would require work that is isolated with only occasional supervision, who would likely have two or more absences from the workplace monthly and who likely would need to take two or more breaks during the workday to deal with the effects of different impairments, each lasting 10 to 15 minutes, could not perform any work. (R. at 47-48.)

In rendering his decision, the ALJ reviewed records from Mountain View Regional Medical Center; Wise County Behavioral Health Services; Community Physicians Clinic; Norton Community Hospital; Appalachia Family Health Center; Stone Mountain Health Services; St. Mary's Health Wagon; University of Virginia Health Systems; Southwestern Virginia Mental Health Institute; Wise County Health Department; Crystal Burke, L.C.S.W.; B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist; and Wellmont Lonesome Pine Hospital. Absher's attorney submitted additional evidence from Dr. TaranDeep Kaur, M.D., to the Appeals Council.[5]

The record shows that Absher received mental health treatment from Wise County Behavioral Health Services, ("Wise County"), beginning in August 2005, and continuing through August 2008. (R. at 375-472.) He saw counselors and a psychiatrist for both counseling and medication management. Absher saw Michael

---

[5] Since the Appeals Council considered and incorporated this additional evidence into the record in reaching its decision, (R. at 1-5), this court also must take this evidence into account when determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

Halcomb, B.A., a case manager, from May 29, 2007, through April 8, 2008. (R. at 375-409.) Over this time, Absher admitted to a long-standing history of substance abuse, including alcohol, marijuana, opiates and benzodiazepines. (R. at 389, 392, 407, 768.) He was advised to contact The Laurels regarding inpatient detoxification, but he never completed such treatment because he did not think he had a substance abuse problem. (R. at 398, 400, 406-07.) According to Halcomb, Absher failed to recognize a connection between his mood state and his extensive substance abuse, and he became very angry when Halcomb suggested his emotional problem was primarily substance-abuse related. (R. at 395, 407.) Absher had difficulty with rudimentary communication and social interaction, and he reported being very anxious. (R. at 398, 409.) He reported difficulty coping with anxiety, and Halcomb opined that Absher used medication and other substances to cope with stress. (R. at 398.) Absher denied suicidal or homicidal ideations, and there was no evidence of thought disturbance, hallucinations or delusions. (R. at 389, 394-95, 407.) Over this time, Absher reported on multiple occasions that he had ceased using substances, but a urine drug screen on November 1, 2007, was positive for opiates, and Absher admitted continued use of alcohol, benzodiazepines, opiates and marijuana. (R. at 389, 392, 768.) Furthermore, on October 24, November 16, and November 26, 2007, Absher expressed concern about passing drug screens from his probation officer. (R. at 392, 394, 396.) However, he relayed his plans to use a "kit" to cleanse himself, to drink plenty of cranberry juice and water to flush his system and to "take something" to help him pass the screens. (R. at 392, 394, 396.) Halcomb noted that Absher viewed these drug screens as part of a "system to beat." (R. at 394.) On August 23, 2007, Absher reported that he was very anxious, but Halcomb described him as alert with a euthymic mood and congruent affect. (R. at 398.) On November 16, 2007, Halcomb reported that Absher appeared consistently

anxious. (R. at 394.) On April 8, 2008, Halcomb completed a DSM-IV Assessment of Absher, diagnosing him with depressive disorder; anxiety disorder, not otherwise specified; and antisocial personality disorder. (R. at 375-76.) He assessed Absher's then-current Global Assessment of Functioning, ("GAF"),[6] score at 50,[7] with his highest in the previous six months being 50 and his lowest being 40.[8] (R. at 375.)

Absher saw Dr. Rhonda Bass, M.D., a psychiatrist, on two occasions, once on July 5, 2007, and again on November 26, 2007. (R. at 390-91, 402-04.) Again, Absher reported his extensive substance abuse history, dating back to his teenage years. (R. at 402.) On July 5, 2007, Absher made intermittent eye contact, established some rapport and exhibited appropriate behavior and mannerisms. (R. at 403.) He had normal speech and only mildly increased psychomotor activity. (R. at 403.) Absher's mood was moderately to severely anxious, and his affect was mildly labile, but appropriate to the conversation. (R. at 403.) He presented no overt symptoms of psychosis, showed no cognitive impairment and demonstrated no then-current dangerousness to himself or others. (R. at 403.) Absher denied then-current suicidal or homicidal ideations, as well as auditory or visual hallucinations. (R. at 404.) Dr. Bass diagnosed Absher with alcohol dependence; polysubstance dependence (marijuana, Xanax, Lortab); polysubstance abuse

---

[6] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[7] A GAF score of 41 to 50 indicates "[s]erious symptoms … OR any serious impairment in social, occupational, or school functioning. …" DSM-IV at 32.

[8] A GAF score of 31 to 40 indicates "[s]ome impairment in reality testing or communication … OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. …" DSM-IV at 32.

(Suboxone, Valium, fentanyl patches, morphine, Skelaxin, cocaine, methamphetamine, Percocet); and substance-induced mood disorder with mixed features of depression and anxiety. (R. at 403.) She placed his then-current GAF score at 40, with the highest in the previous year being 30.[9] (R. at 403.) Dr. Bass opined that his symptoms would best be managed on an inpatient basis, for fear that he might accidentally overdose from mixing prescribed detoxification medications with more alcohol or drugs. (R. at 403-04.) Absher was agreeable to voluntary admission to such a detoxification program. (R. at 404.) However, when Absher returned to Dr. Bass on November 26, 2007, he reported that he had left The Laurels against medical advice. (R. at 390.) He reported overwhelming anxiety, mood swings and paranoia, but denied suicidal ideation. (R. at 390.) Dr. Bass described Absher as depressed and anxious, he made poor eye contact and established little rapport. (R. at 390.) His behavior and mannerisms were inappropriate, and he provided inadequate/evasive answers to questions. (R. at 390.) Absher's speech was normal in rate and rhythm, and psychomotor activity was only mildly increased. (R. at 390.) He did not converse easily or actively participate in treatment discussions and decisions. (R. at 390.) Absher admitted continued use of alcohol, Lortab and Klonopin since last being seen in July 2007, but he minimized his substance abuse. (R. at 390.) He expressed concern about failing a drug screen the next day for his probation officer, which would result in incarceration or seven months of detoxification and/or rehabilitation. (R. at 390.) Dr. Bass reported that Absher was looking for a "magic bullet" and that he lacked insight into his behavior. (R. at 390.)

---

[9] A GAF score of 21 to 30 indicates an individual's "[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment … OR inability to function in almost all areas…." DSM-IV at 32.

Absher saw Dr. Jennifer Ayers, D.O., and Dr. Jody Bentley, D.O., on numerous occasions from July 18, 2007, through April 9, 2009, with complaints of depression and anxiety.  (R. at 474-84, 489-90, 815-28, 890-98.)  In July 2007, he reported independently discontinuing Celexa because it did not help, but Drs. Bentley and Ayers reinitiated it.  (R. at 489-90.)  Absher was alert and oriented with no focal deficits at that time.  (R. at 489-90.)  In August 2007, Absher again reported not taking Celexa as prescribed, stating that he could not afford it.  (R. at 482.)  However, when he was advised of a generic formulation, he stated that the medication did not help.  (R. at 482.)  Drs. Bentley and Ayers informed Absher that they might have to cease treatment of him if he continued to abuse substances. (R. at 482.)  In September 2007, Absher reported lots of anger, but he denied suicidal or homicidal attempts.  (R. at 481.)  In September, October and November 2008, Absher was depressed with a very flat affect, and he reported feeling anxious and edgy all of the time, not sleeping well and having no desire to do anything.  (R. at 474, 816, 818, 821-23, 825.)  Nonetheless, he was fully alert and oriented and denied auditory and visual hallucinations, as well as suicidal and homicidal ideations.  (R. at 474, 816-17, 821-22, 824-25.)

By March 2009, Absher was alert and oriented and denied depression and anxiety.  (R. at 895.)  Drs. Bentley and Ayers advised him to follow up with the Laurels for long-term drug rehabilitation.  (R. at 895.)  In April 2009, he had no complaints and stated he had attended some Alcoholics Anonymous meetings and had started taking Campral.[10]  (R. at 890-91.)  At that time, Absher was alert and oriented with a slightly flat affect.  (R. at 890.)    He had deferred the

---

[10] Campral is a medication used to help alcohol-dependent patients abstain from drinking alcohol. *See* http://www.mayoclinic.org/drugs-supplements/acamprosate-oral-route/description/drg-20066802 (last visited July 30, 2015).

recommendation for long-term rehabilitation. (R. at 891.) Over their treatment of Absher, Drs. Bentley and Ayers diagnosed him with depression, anxiety, alcohol abuse and polysubstance dependence, and they prescribed Celexa, Klonopin, Serax and Propanolol. (R. at 474, 476, 478, 480-81, 490, 815, 818-19, 821, 825-28, 898.)

Absher saw Dr. Paul Augustine, M.D., at Appalachia Family Health Center, on two occasions – once on November 1, 2007, to establish patient care, and again on April 30, 2009. (R. at 643, 646-48, 730-32.) On November 1, 2007, he complained of anxiety and nerves. (R. at 647-48.) Absher was alert and oriented. (R. at 646, 730.) He reported drinking "occasionally," but denied using street or illegal drugs. (R. at 728.) It was noted that Absher had done well on Lexapro in the past. (R. at 647, 731.) Dr. Augustine diagnosed anxiety and depression, he prescribed Vistaril and Lexapro, and he ordered a urine drug screen. (R. at 646, 730.) This drug screen, dated November 2, 2007, was positive for opiates and hyrdocodone. (R. at 668, 768.) Absher did not return to Dr. Augustine until nearly a year and a half later on April 30, 2009, to reestablish himself for continued medical care. (R. at 643, 732.) He was alert, oriented and in no acute distress. (R. at 643, 732.) Absher raised no mental health concerns at that time. (R. at 643, 732.) A urine drug screen was positive for cannabinoid. (R. at 666, 766.)

Absher was seen at St. Mary's Health Wagon on July 25, 2008, reporting that his "nerves [were] shot," among other things. (R. at 773-77.) He further reported drinking eight to 10 beers weekly, and he noted a history of marijuana and cocaine use. (R. at 773.) Absher was diagnosed with anxiety and depression and was referred to Frontier Mental Health. (R. at 774.)

Absher was committed to Southwestern Virginia Mental Health Institute, ("Southwestern"), a psychiatric facility, from August 12 through August 18, 2008, after presenting to the emergency department at Mountain View Regional Medical Center, ("Mountain View"), with complaints of suicidal ideation and intoxication. (R. at 360-70, 798-809.) Absher's blood alcohol content was .119, and a drug screen was positive for cannibinoids. (R. at 363, 801.) The emergency room physician diagnosed Absher with acute depression, alcohol abuse and drug abuse. (R. at 361.) Once at Southwestern, Absher requested something for his "nerves," and he reported suicidal ideation. (R. at 384, 798, 801.) He stated "I wake up and start my day by burning a joint, snort what's around, and drink at least a 6pk of beer." (R. at 384.) Absher reported having undergone no prior drug or alcohol treatment or psychiatric hospitalizations. (R. at 798.) On mental status evaluation, he exhibited reduced eye contact, was tremulous, had a depressed mood with a narrow range of affect and had average intelligence and fair insight and judgment. (R. at 799.) He was fully oriented, could perform serial three subtractions, could memorize three objects for five minutes, could draw an accurate clock with a precise circle and had fair proverb interpretation. (R. at 799, 803.) Absher repeatedly asked for something for his "nerves" and stated "I can't get nobody to do nothing for me so I do it for myself – it's cheaper that way." (R. at 801.) The evaluator, D. Johnston, Psy.D., opined that Absher was medication seeking for benzodiazepines, and he made suicidal threats in an effort to obtain them. (R. at 801.) He was deemed a low risk of harm to himself and a moderate risk of harm to others. (R. at 808.) On August 18, 2008, Johnston diagnosed Absher with polysubstance dependence and depressive disorder, not otherwise specified. (R. at 809.) During the course of his hospitalization, Absher was given clonazepam for tremulous anxiety, which helped. (R. at 800.) Dr. Gershon Silber, M.D., diagnosed Absher with polysubstance dependence and assessed his then-current

-12-

GAF score at 50. (R. at 800.) His condition on discharge on August 19, 2008, was described as calm, quiet and not suicidal or homicidal. (R. at 800.) Aftercare was scheduled with Wise County and St. Mary's Health Wagon. (R. at 800.)

Absher was hospitalized at Norton Community Hospital, ("Norton Community"), from March 1 through March 3, 2009, for an altered mental status and acute delirium after drinking "a little" alcohol. (R. at 865-77.) He reported vomiting, racing thoughts, a sensation of being in a tunnel, a sensation of falling, weakness and confusion. (R. at 867.) Absher stated that he drank to deal with his thoughts because he could not afford to see a psychiatrist. (R. at 867.) He reported drinking and smoking marijuana "a lot," but wanted help for his addiction. (R. at 867.) Absher denied suicidal or homicidal ideations, anxiety or hallucinations. (R. at 868.) A urine drug screen was positive to tricyclics and tetrahydrocannabinol, ("THC"). (R. at 868.) During his hospitalization, he was treated with Thiamine, Ativan and Celexa. (R. at 869.) Absher's discharge diagnoses included altered mental status, acute delirium and depression, and he was prescribed Celexa, thiamine, Carafate and Serax. (R. at 865-66.) Absher was transported back to Norton Community by law enforcement on March 17, 2009, for complaints of depression and suicidal thoughts. (R. at 862-63.) He stated that he had run out of benzodiazepines. (R. at 862.) Absher received intravenous Ativan, he was diagnosed with anxiety and depression, and he was prescribed Serax. (R. at 863-64.)

Absher treated with Dr. TaranDeep Kaur, M.D., at Appalachia Family Health Center, from September 22, 2009, through May 7, 2012, for his mental, as well as physical, conditions. (R. at 620-42, 680-83, 685-702, 704-24, 1035-37, 1044-55, 1102-04, 1189-1239.) Over Dr. Kaur's treatment of Absher, he

-13-

complained of depression, anxiety, paranoia, racing thoughts and frequent hand washing. (R. at 638, 688-90, 694-96, 720, 1044-46, 1050-52, 1201.) Absher claimed to have stopped consuming alcohol during this time, but he continued to struggle with drug use. (R. at 619, 634-35, 691, 694, 697, 700, 716-17, 742, 1047, 1050, 1053, 1102, 1201, 1203, 1219, 1257.)

In November 2009, he reported that he was going to Frontier Health approximately once weekly and had attended some NA meetings. (R. at 635, 716.) In June 2010, Absher reported hearing voices, but admitted he had stopped taking his medications and was smoking marijuana. (R. at 619, 700.) In September 2010, Absher again reported hearing people talking, but stated he did not want to take medications for hallucinations. (R. at 691, 1047.) Dr. Kaur scheduled Absher to begin counseling. (R. at 693, 1049.) Dr. Kaur diagnosed Absher with obsessive compulsive disorder, ("OCD"), depression, paranoia, bipolar disorder without psychosis, mood disorder without psychosis and questionable opiate dependence. (R. at 621, 625, 632, 637, 680, 696, 699, 702, 707, 719, 1041, 1046, 1052, 1055, 1191, 1197, 1200, 1203, 1209, 1221.) However, despite Absher's complaints and Dr. Kaur's diagnoses, Dr. Kaur's mental status evaluations of Absher are best described as normal. He was consistently found to be alert and oriented and in no acute distress. (R. at 620, 624, 627, 630, 632, 638, 641, 689, 692, 698, 706, 709, 720, 723, 1040, 1045, 1048, 1054, 1103, 1187, 1190, 1193, 1196, 1199, 1202, 1208, 1214.) Absher also was repeatedly deemed to have a normal memory, mood, affect, insight and judgment. (R. at 620, 624, 627, 682, 689, 692, 698, 706, 709, 1040, 1045, 1048, 1054, 1103, 1187, 1190, 1193, 1196, 1199, 1202, 1208, 1214.) Dr. Kaur prescribed various medications, including Paxil, Prozac, Xanax and Seroquel. (R. at 621, 632, 635, 637, 680, 683, 690, 696, 699, 702, 716, 719, 1037, 1046, 1052, 1055, 1191, 1197, 1200, 1203, 1209, 1212, 1221.) There are

numerous notations in the treatment notes that these medications helped to lessen Absher's symptoms when he was compliant. For instance, on November 5, 2009, Absher reported doing "very good" with Paxil, and on December 8, 2009, he expressed a desire to have the dosage increased, as it was working. (R. at 632, 635, 716-17.) On June 28, 2010, Absher reported that he began hearing voices after he stopped taking Paxil. (R at 619, 700.) On July 12, 2010, he reported that Prozac helped with his anxiety. (R. at 697-99, 1053-55.) On September 22, 2010, he stated that Prozac "[took the] edge off." (R. at 691, 1047.) On October 28, 2010, Absher stated that Seroquel was helping him sleep, and he felt better overall, aside from having an altercation with his mother. (R. at 1043.) On November 18, 2010, Absher requested additional Seroquel because it calmed him. (R. at 1039-41.) On December 16, 2010, it was noted that Seroquel was helping Absher. (R. at 681-83, 1035-37.) Finally, on September 29, 2011, Absher reported being paranoid when he was off of his medications. (R. at 1201.)

Absher was hospitalized at the University of Virginia from March 21 through March 23, 2010, after presenting to the emergency department at Mountain View on March 16, 2010, with complaints of nausea, vomiting and abdominal pain. (R. at 951-61, 997-1000.) He was admitted for further treatment and evaluation of Hepatitis C and tuberculosis. (R. at 956.) Absher was alert, oriented, cooperative and pleasant. (R. at 957, 960.) He admitted using alcohol and intravenous drugs, as well as intranasal cocaine, of which he was a chronic active user. (R. at 957, 997.) A review of systems on March 18, 2010, was notable for depression and anxiety. (R. at 998.) Absher reported some occasional confusion related to substance abuse, but none recently. (R. at 999.) Therapy for Absher's Hepatitis C was deferred at that time due to his substance abuse. (R. at 999.) He

was discharged on March 23, 2010, with diagnoses of drug-induced Hepatitis, chronic Hepatitis C and polysubstance abuse.  (R. at 997.)

Jeanne Buyck, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), on September 7, 2010, in connection with Absher's initial disability determination.  (R. at 55-56.)  Buyck found that Absher was only mildly restricted in his activities of daily living, had mild difficulties in maintaining social functioning, had no difficulties maintaining concentration, persistence or pace and had experienced no repeated episodes of decompensation, each of extended duration.  (R. at 55.)  She concluded that Absher's mental impairments were nonsevere.  (R. at 55.)  Buyck opined that Absher's statements regarding his symptoms were partially credible.  (R. at 56.)  She noted that his significant history of polysubstance abuse was a primary contributor to his impairments.  (R. at 56.)  Buyck further noted Absher's history of noncompliance in both therapy/detoxification programs and medication management.  (R. at 56.)

Absher saw Crystal Burke, L.C.S.W., a licensed clinical social worker at Stone Mountain Health Services, for counseling from October 21, 2010, through November 18, 2010.  (R. at 684, 1038, 1042-43.)  He reported feelings of paranoia, experiencing auditory hallucinations and an inability to control his thoughts.  (R. at 684, 1038, 1042-43.)  He stated that he felt like people were out to get him and that other people knew his thoughts.  (R. at 684, 1038, 1042.)  However, he denied suicidal or homicidal ideations or any intent to harm himself or others.  (R. at 1042-43.)  On mental status evaluations, Burke described Absher as alert and oriented, very irritable with paranoid thought content/processes, but with fair hygiene and grooming and no overt perceptual disturbances, despite his report of auditory hallucinations.  (R. at 684, 1038, 1042-43.)  On October 28, 2010, Absher

reported that Seroquel was helping him sleep, and he felt overall better aside from an altercation with his mother. (R. at 1043.) Nonetheless, Burke noted that Absher appeared to have difficulty with an explosive personality. (R. at 1043.) Likewise, on November 18, 2010, he reported that Seroquel decreased his auditory hallucinations. (R. at 684, 1038.) Burke found his mood to be more stable with some decrease in psychotic symptoms at that time. (R. at 684, 1038.) She diagnosed Absher with a mood disorder, not otherwise specified; psychotic disorder, not otherwise specified; and rule out bipolar I disorder, mixed, severe, with psychotic symptoms. (R. at 684, 1038.)

Burke completed a mental assessment of Absher on December 30, 2010, finding that he had a seriously limited ability to follow work rules, to understand, remember and carry out both simple and detailed job instructions and to maintain personal appearance. (R. at 1064-67.) In all other areas of making occupational, performance and personal/social adjustments, Burke found that Absher had no useful ability to function. (R. at 1064-65.) In support of her findings, Burke noted Absher's mood disorder with psychotic features, poor impulse control and very poor thought organization and concentration. (R. at 1064-65.) She opined that Absher would be absent from work, on average, more than two days monthly due to his impairments or treatment. (R. at 1066.)

Absher did not return to Burke until nearly two years later, on September 6, 2012, reporting continued "bad nerves" and feeling "really down." (R. at 1313.) Burke described Absher as alert, oriented and anxious with a depressed mood, limited insight and obsessive thoughts. (R. at 1313.) Absher refused to sit in the lobby because there were "too many people." (R. at 1313.) Burke diagnosed Absher with a mood disorder, not otherwise specified. (R. at 1313.) She

-17-

completed another mental assessment of Absher on September 20, 2012, finding that he had a limited, but satisfactory, ability to understand, remember and carry out simple job instructions and a seriously limited ability, resulting in unsatisfactory work performance, to understand, remember and carry out detailed, but not complex job instructions and to maintain personal appearance. (R. at 1315-17.) In all other areas of making occupational, performance and personal/social adjustments, Burke concluded that Absher had no useful ability to function. (R. at 1315-16.) She opined that Absher could not manage benefits in his own best interest and that he would be absent from work more than two days monthly. (R. at 1317.) Burke based her findings on Absher's very poor impulse control and mood disorder, not otherwise specified. (R. at 1315.)

The record reveals that on no less than 21 occasions from June 24, 2007, through February 22, 2011, Absher presented to the emergency departments at Mountain View and Norton Community for various complaints, including withdrawal symptoms, pneumonia, anxiety, back pain, "nerves," nausea, a laceration to the nose and abdominal pain and vomiting. (R. at 347-59, 542-615, 918-29, 1016-30, 1069-80, 1087-91, 1110-31, 1133-38, 1140, 1146-69.) Drug screens were positive for multiple substances, including benzodiazepines, cannabinoids, opiates, cocaine, THC, marijuana and barbiturates. (R. at 353, 358, 582, 589, 837-41, 1030, 1093.) On July 29, 2007, Absher admitted snorting Lortab and Percocet, and on August 21, 2009, while being treated for a laceration to the nose, an x-ray technologist noted that he was uncooperative and smelled of alcohol. (R. at 593, 932.) Nonetheless, Absher was repeatedly alert and fully oriented with a normal mood and affect with no motor or sensory deficits. (R. at 347, 356, 537, 540, 544, 548, 569, 595, 919, 1072, 1078, 1140, 1146-47, 1162.) On August 24, 2007, Absher appeared only mildly anxious with a flat affect. (R. at

356.)  On February 22, 2011, he appeared alert, but anxious.  (R. at 1087.)  On May 10 and August 31, 2009, as well as January 9 and February 9, 2011, it was noted that Absher demonstrated normal behavior for his age and the situation, he could perform all activities of daily living without assistance, and he demonstrated the ability and willingness to learn.  (R. at 1069-72, 1078, 1147, 1162.)  Absher was diagnosed with alcohol and controlled substance abuse, anxiety/depression and alcohol withdrawal and intoxication, among other things.  (R. at 348, 544, 551, 564, 582, 588-91, 926.)  He was prescribed Vistaril and Paxil, and his alcohol withdrawal was treated with Ativan.  (R. at 348, 563-64, 590.)

On April 20, 2011, Julie Jennings, Ph.D., another state agency psychologist, completed a PRTF in connection with Absher's disability determination on reconsideration.  (R. at 83-85.)  Jennings found that Absher was mildly restricted in his activities of daily living, had mild difficulties maintaining social functioning, moderate difficulties maintaining concentration, persistence or pace and had experienced no repeated episodes of decompensation, each of extended duration. (R. at 83-84.)  She found Absher's statements regarding his symptoms partially credible, noting his significant history of polysubstance abuse being a primary contributor of his impairments.  (R. at 85.)  Jennings also noted Absher's history of noncompliance in both therapy/detoxification programs and medication management.  (R. at 85.)  Jennings also completed a mental residual functional capacity assessment, finding that Absher was moderately limited in his ability to understand, remember and carry out detailed instructions, to maintain attention and concentration for extended periods, to work in coordination with or in proximity to others without being distracted by them, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest

periods and to interact appropriately with the general public. (R. at 87-88.) She concluded that Absher was limited to simple, unskilled nonstressful work. (R. at 88.) Jennings noted that, while Absher occasionally felt anxious or depressed, the evidence showed an ability to care for his personal needs, that he understood and followed directions, cooperated with others and participated in a wide variety of daily activities. (R. at 91.) She concluded that, while Absher was not capable of performing past work, he could perform less demanding work. (R. at 91.)

B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, completed a psychological evaluation of Absher at the request of his attorney on July 2, 2012. (R. at 1175-84.) He reported drinking excessively in the past, and that marijuana was the only illegal drug he had used, which was "many years ago." (R. at 1177.) He admitted receiving counseling and being psychiatrically hospitalized, but he stated that he was then-currently receiving no mental health treatment. (R. at 1178.) Absher stated he was dating someone, and he socialized with his parents, some friends and his girlfriend. (R. at 1178.) On mental status evaluation, Absher was fully oriented, his grooming and hygiene were adequate, his speech was clear and intelligible, and he exhibited no signs of ongoing psychotic process, nor evidence of delusional thinking. (R. at 1176, 1179.) He denied hallucinations. (R. at 1179.) Absher's affect was overall rather flat, and he made poor eye contact. (R. at 1179.) He reported depression "on and off" for some years. (R. at 1179.) He stated that he preferred to be alone sometimes, but denied suicidal or homicidal ideation, plan or intent, but admitted one suicidal attempt in the past by medication overdose. (R. at 1179.) Absher reported that his short-term memory was becoming progressively worse, and he described his concentration as erratic and poor, noting that his mind wandered. (R. at 1179.) Absher also reported often

being nervous, and he believed he suffered ongoing anxiety and panic attacks. (R. at 1179.)

Absher could perform serial threes, and he gave a higher order and correct interpretations to a commonly used adage. (R. at 1179.) The results of the Wechsler Adult Intelligence Scale – Fourth Edition, ("WAIS-IV"), included a full-scale IQ score of 81, placing Absher in the low average range of intellectual functioning, a verbal comprehension index of 87, placing him in the low average range of intellectual functioning, a perceptual reasoning index of 77, placing him in the borderline range of intellectual functioning, a working memory index of 86, placing him in the low average range of intellectual functioning and a processing speed index of 92, placing him in the average range of intellectual functioning. (R. at 1180.) Lanthorn deemed these results valid. (R. at 1180.) However, he opined that the results of the Minnesota Multiphasic Personality Inventory – Second Edition, ("MMPI-2"), should be interpreted with caution due to possible invalidity. (R. at 1181.) Specifically, Lanthorn felt that Absher may have responded in an unselective or random manner to items toward the end of the test, or there may have been some distortion in his responses due to confusion and a high degree of ongoing anxiety, or this also may have occurred due to symptom exaggeration. (R. at 1181.) The testing indicated that Absher was experiencing moderate to possibly severe personal distress, that he had attention and concentration difficulties, as well as memory deficits, and was likely to exhibit poor judgment. (R. at 1181.) Testing further indicated a modest degree of anxiety, worry, tension and emotional discomfort, and Absher's psychopathology included some confused thinking, difficulties in logic and concentration and impaired judgment. (R. at 1182.) Lanthorn concluded that Absher's allegations of psychologically disabling conditions were only partially credible, and he deemed his overall prognosis as

somewhat guarded. (R. at 1183.) He found that Absher had some signs and symptoms of mild to moderate levels of depression and anxiety at times. (R. at 1183.) Lanthorn diagnosed Absher with polysubstance dependence in sustained full remission (by claimant's self-report); major depressive disorder, recurrent, moderate; rule out intermittent explosive disorder; and personality disorder, not otherwise specified (with borderline features); and he placed Absher's then-current GAF score at 55 to 59.[11] (R. at 1182-83.)

Lanthorn completed a mental assessment of Absher on July 2, 2012, finding that he had a more than satisfactory ability to understand, remember and carry out simple job instructions, a limited, but satisfactory, ability to follow work rules, to understand, remember and carry out complex job instructions and to maintain personal appearance and a seriously limited ability, resulting in unsatisfactory work performance, to relate to co-workers, to deal with the public, to use judgment, to interact with supervisors, to deal with work stresses, to function independently, to maintain attention/concentration, to understand, remember and carry out detailed, but not complex, job instructions, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability. (R. at 1171-73.) Lanthorn opined that Absher could manage benefits in his own best interest and that he would miss more than two workdays monthly. (R. at 1173.) He based his findings on Absher's diagnoses of polysubstance dependence in sustained full remission; major depressive disorder, recurrent, moderate; rule out intermittent explosive disorder; and personality disorder, not otherwise specified. (R. at 1171.)

---

[11] A GAF score of 51 to 60 indicates "[m]oderate symptoms … OR moderate difficulty in social, occupational, or school functioning. …" DSM-IV at 32.

## III.  Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2014). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920.  If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2014).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner.  To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2011 & West 2012); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute

its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(c), 416.927(c), if he sufficiently explains his rationale and if the record supports his findings.

Absher argues that the ALJ erred by improperly determining his mental residual functional capacity. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 5-7). Specifically, Absher argues that the ALJ erred in his weighing of the psychological evidence of record by according only "some weight" to Burke's opinions and "more weight" to Lanthorn's opinions, but failing to acknowledge Lanthorn's finding that Absher's ability to perform several work-related mental abilities was "unsatisfactory." (Plaintiff's Brief at 6-7.) As noted above, Absher does not challenge the ALJ's finding as to his physical residual functional capacity.

After a review of the evidence of record, I find Absher's argument unpersuasive. The ALJ must consider objective medical facts and the opinions and diagnoses of both treating and examining medical professionals, which constitute a major part of the proof in disability cases. *See McLain*, 715 F.2d at 869. The ALJ must generally give more weight to the opinion of a treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2014). However, neither Burke nor Lanthorn is such a treating source of Absher. Thus, neither of their opinions is entitled to "controlling weight" even if supported by the clinical evidence and even if consistent with the other substantial evidence of record. Burke, a licensed clinical social worker, also is not an "acceptable medical source" under the regulations, whose opinions may be used to establish the presence of a medically determinable impairment. *See* 20 C.F.R. §§ 404.1513(a), 416.913(a) (2014). However, Burke is considered an "other source," whose opinions may be used to establish the severity of a claimant's impairments and the resulting effect on his ability to work. *See* 20 C.F.R. §§ 404.1513(d), 416.913(d) (2014). For all of these reasons, the ALJ must consider the following factors in deciding how much weight to assign to Burke's and Lanthorn's opinions: (1) the length of treatment of the claimant; (2) the frequency of examination of the claimant; (3) the nature and extent of the treatment relationship; (4) support of the source's opinion afforded by the medical evidence of record; (5) consistency of the opinion with the record as a whole; and (6) specialization of the source. *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

Turning first to Burke, she saw Absher on three occasions for counseling over an approximate one-month period, then saw him once more nearly two years later. Thus, the length and frequency, as well as the nature and extent of Burke's

treatment of Absher, do not warrant giving her assessments any greater weight. Burke, as a licensed clinical social worker, is specialized in mental health counseling. Therefore, this factor does cut in favor of giving her assessments more weight. However, for the reasons that follow, I find that Burke's assessments are neither supported by the medical evidence of record nor consistent with the record as a whole.

As stated previously, Absher saw Burke for counseling from October 21, 2010, through November 18, 2010, on three occasions, and on one other occasion, nearly two years later, on September 6, 2012. Over this time, Burke diagnosed Absher with a mood disorder, not otherwise specified; and a psychotic disorder, not otherwise specified. While Burke found that Absher was irritable, paranoid, anxious, depressed and had limited insight, she also found that he was alert and oriented, had no overt perceptual disturbances and, by November 18, 2010, had a more stable mood overall with some decrease in psychotic symptoms. Burke's treatment notes further reflect that Absher's symptoms were lessened with Seroquel. Thus, I find that Burke's December 30, 2010, mental assessment of Absher, finding, among other things, that he had no useful ability to perform all but four of the work-related mental abilities assessed, and the September 20, 2012, mental assessment, finding that he had no useful ability to perform all but three such abilities, is not supported by her own treatment notes. Furthermore, treatment notes from other medical sources during the same time do not support Burke's mental assessments. For instance, Dr. Kaur's treatment notes from October 21, 2010, through May 7, 2012, show that, despite Absher's complaints of paranoia, he was repeatedly deemed fully oriented with a normal memory, mood, affect, judgment and insight. Absher also requested additional Seroquel during this time period because it helped his symptoms. Additionally, two emergency department

visits on January 9, and February 9, 2011, reflect that Absher's behavior was normal and appropriate for his age and the situation, he was alert and oriented, and it was noted that he could perform all activities of daily living without assistance. These notes further indicate that Absher exhibited the ability and willingness to learn. Even when Absher was psychiatrically hospitalized at Southwestern in August 2008, he was described as having fair intelligence, insight and judgment, and he could perform serial three subtractions, memorize three objects for five minutes, draw an accurate clock with a precise circle and had fair proverb interpretation. Furthermore, there are multiple references throughout the treatment notes that medications helped Absher's symptoms when he was compliant. "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986). Finally, Burke's opinions are not supported by those of Lanthorn, to which I now will turn my attention.

Psychologist Lanthorn, an "acceptable medical source," saw Absher for a psychological evaluation on one occasion at the request of counsel. Thus, the length and frequency, as well as the nature and extent of Lanthorn's treatment, do not warrant giving his assessment any greater weight. However, Lanthorn, as a licensed clinical psychologist, is specialized in the treatment of mental health patients. Therefore, this factor cuts in favor of according more weight to his opinions. However, as with Burke, some of the findings contained in Lanthorn's assessment are neither supported by the medical evidence of record nor consistent with the record as a whole. Lanthorn opined that Absher had a more than satisfactory ability to understand, remember and carry out simple job instructions, a limited, but satisfactory, ability to follow work rules, to understand, remember and carry out complex job instructions and to maintain personal appearance and a

seriously limited ability, resulting in unsatisfactory work performance, to relate to co-workers, to deal with the public, to use judgment, to interact with supervisors, to deal with work stresses, to function independently, to maintain attention/concentration, to understand, remember and carry out detailed job instructions, to behave in an emotionally stable manner, to relate predictably in social situations and to demonstrate reliability. He further opined that Absher would miss more than two workdays monthly. Lanthorn based these opinions on Absher's diagnoses of polysubstance dependence in sustained full remission; major depressive disorder, recurrent, moderate; rule out intermittent explosive disorder; and personality disorder, not otherwise specified. It is important to note that the medical evidence of record shows that Absher misrepresented his history of substance abuse to Lanthorn. This misrepresentation, of itself, would justify the ALJ's rejection of Lanthorn's opinion.

While the ALJ stated in his decision that he was giving "more weight" to Lanthorn's opinion than he gave to Burke's, Absher argues that the ALJ erred by failing to acknowledge Lanthorn's findings that his ability to perform several work-related mental abilities was seriously limited, resulting in "unsatisfactory" work performance. I disagree. It is the sole responsibility of the ALJ to determine residual functional capacity at the hearing level. *See* 20 C.F.R. §§ 404.1546(c), 416.946(c) (2014). The ALJ is not bound to accept, in whole, a residual functional capacity assessment of a claimant as found by a mental health source. Instead, taking the evidence of record in total, the ALJ may craft an appropriate residual functional capacity finding. Based on all of the evidence set forth herein, and for the reasons stated below, I find that is what the ALJ did in this case.

First, Lanthorn opined that the results of the MMPI-2 should be viewed with caution, as Absher could have skewed the test results, either by answering unselectively or randomly toward the end of the test or by exaggerating his symptoms. Next, Lanthorn's mental status evaluation of Absher was relatively benign, reflecting that he was fully oriented with adequate grooming and hygiene, clear and intelligible speech, and no signs of ongoing psychotic process nor evidence of delusional thinking. Absher denied hallucinations. Despite Absher's allegation that his concentration was erratic and poor, he could perform serial threes, and he gave a higher order and correct interpretation to a commonly used adage. Moreover, the WAIS-IV results, which Lanthorn deemed valid, yielded a full-scale IQ score of 81, a verbal comprehension index of 87 and a working memory index of 86, all of which placed him in the low average range of intellectual functioning, as well as a processing speed index of 92, placing him in the average range of intellectual functioning. Lanthorn deemed Absher's allegations of psychologically disabling conditions only partially credible, finding that he had some signs and symptoms of only mild to moderate levels of depression and anxiety at times. Lanthorn assessed Absher's then-current GAF score at 55 to 59, indicating only moderate symptoms. Additionally, while Absher had previously attended some mental health counseling, he was not receiving such counseling at the time of the psychological evaluation by Lanthorn. Thus, Lanthorn's findings that Absher had no useful ability to perform the majority of work-related mental abilities, as set out above, simply is not supported by his own clinical examination of Absher. Furthermore, these restrictive findings in Lanthorn's assessment also are not supported by the same evidence of record as discussed above with respect to Burke's assessments.

-29-

Based on the above reasoning, I conclude that substantial evidence supports the ALJ's weighing of the psychological evidence, and I further find that substantial evidence exists in the record to support the ALJ's mental residual functional capacity finding. An appropriate order and judgment will be entered.

DATED:     July 31, 2015.

_/s/_ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE